UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

– against –

SHANI MONCRIEFFE,

Defendant.

**MEMORANDUM, ORDER
AND JUDGMENT OF
DISMISSAL**

15-CR-366

**Parties**

**Shani Moncrieffe**
*also known as*
Shawn Moncrieffe
*also known as*
Sean Lyons

**Appearances**

**Jan Alison Rostal**
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
(718) 330-1207
Email: Jan_Rostal@fd.org

**S. Isaac Wheeler**
Federal Defenders of New York, Inc.
52 Duane Street, 10th Floor
New York, NY 10007
(212) 417-8717
Email: isaac_wheeler@fd.org

**United States of America**

**Alicia Nicole Washington**
U.S. Attorney's Office, Eastern
District of New York
271 Cadman Plaza East
Brooklyn, NY 11201
(718) 254-6009
Email: alicia.washington@usdoj.gov

**JACK B. WEINSTEIN, Senior United States District Judge:**

## Table of Contents

I.   Introduction ........................................................................................................ 2

II.  Factual Background ........................................................................................... 3

   A. Early Life ...................................................................................................... 3

   B. 1993 Robbery Arrest ..................................................................................... 4

   C. Robbery Indictment and Guilty Plea ............................................................ 4

   D. Criminal Sale of a Controlled Substance ..................................................... 4

   E. Immigration Proceedings .............................................................................. 5

     1.   Deportation Hearing ............................................................................. 5

     2.   Board of Immigration Appeals .......................................................... 11

       a.   Remand to Immigration Judge .................................................. 11

       b.   Immigration Judge Decision Affirmed ..................................... 12

       c.   Relief from Deportation ............................................................ 14

     3.   Deportation ........................................................................................ 15

   F. Return to United States ................................................................................ 15

   G. Arrest and Indictment in Instant Case ........................................................ 16

III. Defendant's Motion to Dismiss Indictment .................................................... 17

IV.  Law ................................................................................................................. 17

   A. Illegal Reentry ............................................................................................ 17

   B. Collateral Challenge to Prior Deportation Order ....................................... 18

     1.   Exhaustion of Remedies .................................................................... 19

     2.   Opportunity for Judicial Review ....................................................... 19

     3.   Unfairness of Deportation Order ....................................................... 22

V.   Application of Law to Facts ............................................................................ 22

   A. Defendant Exhausted Administrative Remedies ........................................ 22

   B. Defendant Denied Opportunity for Judicial Review .................................. 23

   C. Deportation Order Fundamentally Unfair ................................................... 25

     1.   Misapplication of Categorical Approach ........................................... 26

       a.   Aggravated Felony ................................................................... 28

         i.   General Rule .................................................................... 28

         ii.  Special Problem of Interpretation of State Law by State Court ..................... 36

       b.     Firearms Offense ............................................................................... 37

           i.    BIA Inference Impermissible ......................................... 38

           ii.   No Categorical Match in "Firearm" Definition............................... 46

    2.     Denial of Section 212(c) Relief on Comparable Grounds ...................................... 47

    3.     Prejudice .............................................................................. 49

  VI. Conclusion ................................................................................. 50

## I.    Introduction

This case joins a distressing group in which an injustice has been committed because a person threatened with deportation has no attorney. Shani Moncrieffe, the defendant, faced deportation proceedings in 1995, after he pled guilty in a New York State court to the crime of robbery in the first degree. Nineteen years old, in shackles, without counsel and without the guidance of anyone, including his mother who was on life support, Mr. Moncrieffe was tried *pro se* before an immigration judge and the Board of Immigrations Appeal ("BIA"). He was found to be deportable and ineligible for further relief because they assumed, improperly, that he had been convicted in New York of an aggravated felony and a firearms offense.

Deported, he soon returned to the United States. Some twenty years later, after a life free of crime and after becoming a role model for his family and community, Mr. Moncrieffe again faces deportation. He has been charged with the crime of illegal reentry.

On December 16, 2015, he filed a motion to dismiss the indictment in the instant case, challenging the validity of the 1995 deportation order. Alleged is that the deportation following his 1993 state conviction was procedurally unfair and obtained in violation of immigration law and due process. If this claim is established—as it is—the 1995 deportation cannot serve as the basis for the current illegal reentry criminal prosecution.

Mr. Moncrieffe's deportation was improper. It was based on a misapplication of the categorical approach in determining whether his state conviction supported removal. Had the

categorical approach been properly applied, he would not have been found to be deportable, the immigration proceedings would have been terminated, he would not have been deported, and he would not have entered the country illegally. *See infra* Part V.C.1–3.

Defendant's motion to dismiss the indictment is granted.

## II. Factual Background

### A. Early Life

Shani Moncrieffe is a 40 year old citizen of Jamaica. Decl. of Jan A. Rostal in Support of Def.'s Motion to Dismiss Indictment, Dec. 16, 2015, ECF No. 24 ("Rostal Decl."), at ¶¶ 4, 17. He first arrived in the United States in 1982, at age seven, when he immigrated with his mother and two siblings. *See id.*, Ex. D, Immigrant Visa and Alien Registration ("Ex. D"), at SM000303. He entered as a lawful permanent resident on an immigrant visa based on the petition of his mother. *Id.*; *see also* Gov't's Mem. of Law in Opp'n to Def.'s Mot. to Dismiss Indictment, Feb. 2, 2016, ECF No. 29 ("Gov't Opp'n Mem."), Ex. 1, Record of Deportable Alien ("Ex. 1"), at SM000051.

The defendant grew up in small low-rent apartments in Queens, where he lived with his mother, two sisters, his stepfather, stepsiblings, and adopted sister. Rostal Decl., at ¶ 5. His mother worked at night as a nursing home caretaker and took part-time weekend jobs to support the family. *Id.* As a boy, Mr. Moncrieffe held a variety of jobs, including running a paper route, bagging groceries, and bussing tables at restaurants. *Id.*

Defendant struggled in school and was repeatedly held back. *Id.* at ¶ 6. He attended, but dropped out of, Springfield Gardens High School, which closed in 2008 due to low test scores and a high drop-out rate. *Id.* Drugs and gang activity were prevalent problems in his high school and among his neighborhood peers. *Id.*

### B. 1993 Robbery Arrest

In 1993, at age eighteen, Mr. Moncrieffe was arrested after he and two other boys robbed passengers on a bus. *Id.* at ¶ 7. He claims that the crime was carried out to help a friend repay a debt to a drug dealer who had threatened violence in case of non-payment. *Id.* at ¶ 6.

### C. Robbery Indictment and Guilty Plea

On August 26, 1993, defendant was indicted in Queens County, New York, for robbery in the first degree in violation of New York Penal Law sections 160.15(2) and 160.15(4). *See* Gov't Opp'n Mem., Ex. 2, *People v. Pope, et al.*, Indictment No. 3352/93 ("Ex. 2"), at SM000253–54. Charged was that on or about July 30, 1993, the defendant, together with two other named persons: (1) "forcibly stole . . . United States currency . . . and in the course of the commission of the crime or of immediate flight therefrom," the defendant was "armed with a deadly weapon to wit: a handgun"; and (2) forcibly stole money from an individual, and "displayed what appeared to be a handgun." *See id.* at SM000254.

Shortly after he was charged, and on the advice of appointed counsel, Mr. Moncrieffe pled guilty to the crime of robbery in the first degree in violation of New York Penal Law section 160.15. *See* Rostal Decl., at ¶ 7; *see also* Gov't Opp'n Mem., Ex. 3, Sentence & Commitment, Oct. 22, 1993 ("Ex. 3"), at SM000198. There is no satisfying proof that he pled to any specific subsection of section 160.15. He was sentenced to an indeterminate term of imprisonment of between three and one-third to ten years. *See* Gov't Opp'n Mem., Ex. 3, at SM000198. Defendant states that he was not advised of the possibility that he could be deported as a result of his guilty plea. Rostal Decl., at ¶ 7.

### D. Criminal Sale of a Controlled Substance

In June 1993, prior to being sentenced for the robbery, defendant was separately indicted in Kings County for criminal sale of a controlled substance in the third degree in violation of New

York Penal Law section 220.39(1). *See* Gov't Opp'n Mem., Ex. 6, *People v. Bradum, et al.*, Indictment No. 6170/93 ("Ex. 6"), at SM000214–15. Charged was that the defendant, together with two other named persons, knowingly and unlawfully sold cocaine. *See id.* In March 1994, Mr. Moncrieffe pled guilty to criminal sale of a controlled substance in the third degree in violation of New York Penal Law Section section 220.39(1). *See* Gov't Opp'n Mem., Ex. 7, Sentence & Commitment, Mar. 28, 1994 ("Ex. 7"), at SM000217. He was sentenced to one to three years imprisonment to run concurrently with his sentence for robbery in the first degree. *Id.*

### E. Immigration Proceedings

#### 1. Deportation Hearing

On October 19, 1994, the Immigration and Naturalization Service ("INS") issued an Order to Show Cause based on defendant's New York robbery conviction. Rostal Decl., Ex. F, Order to Show Cause and Notice of Hearing, Oct. 19, 1994 ("Ex. F"). Charged was that Mr. Moncrieffe was a "deportable alien" pursuant to two grounds: (1) conviction of an aggravated felony of robbery; and (2) conviction of a firearms violation. *See* § 241(a)(2)(A)(iii), 8 U.S.C. § 1251(a)(2)(A)(iii) (1994); § 241(a)(2)(C), 8 U.S.C. § 1251(a)(2)(C) (1994); Rostal Decl., at ¶ 8 and Ex. F.

On February 9, 1995, an immigration judge conducted a deportation hearing while Mr. Moncrieffe was serving his state sentence at the Ulster Correctional Facility in Napanoch, New York. Rostal Decl., Ex. A, Oral Decision of the Immigration Judge and Transcript of Proceedings, Feb. 9, 1995 ("Ex. A"). Aged nineteen, Mr. Moncrieffe appeared in shackles and without counsel. *Id.* The immigration judge informed Mr. Moncrieffe of his right to an attorney, but no effort was made by anyone to provide an attorney for this administrative hearing:

> [IMMIGRATION JUDGE:] What would you like to do? *You've got to make a choice this morning.* You can either go ahead with your hearing this morning with me and you can represent yourself

or you can ask me for a delay in which you can try to find yourself a lawyer.

[MR. MONCRIEFFE:]  I want to go ahead.

Q.  You want to go ahead this morning?

A.  Yes.

Q.  Do you waive your right to a lawyer?

A.  *I'm going to get a lawyer later on.*

Q.  *But you want to go ahead with it now?*

A.  *Yeah.*

Q.  What's going to happen to you if I deport you and there's no need for a lawyer later on?  There won't be a later on.  Have you thought about that?

A.  I want –

Q.  You know, you can be deported this morning if you go ahead and represent yourself.  Do you understand that?

A. Yes.

Q.  Is that what you want to do?

A.  Yeah, I want to go on.

Q.  *You want to go ahead with your case?*

A.  Yeah.

Q.  *Without a lawyer.*  All right, sir, we'll do that.

*Id*. at 2:5–3:2 (emphasis added).

The hearing continued and Mr. Moncrieffe proceeded, *pro se*, to answer the questions of the immigration judge.  Asked was whether he was a citizen of Jamaica who entered the country at New York City as a legal permanent resident around May 13, 1982; the defendant responded "Yes." *Id*. at 4:9–13.  The immigration judge also asked whether the defendant had been convicted of robbery in the first degree on October 1, 1993 in Queens County, New York; whether he

admitted that he was armed with a handgun during the robbery; and whether he was sentenced to a term of three years and four months to ten years of imprisonment.  Mr. Moncrieffe responded "Yes" to all three questions:

> Q.  I'm going to ask you some questions that come directly from that Order to Show Cause and I want you to answer each of them as truthfully as you can.
>
> The first question is, sir, you are not a native of the U.S., are you?
>
> A.  No.
>
> Q.  Are you a native and citizen of Jamaica?
>
> A.  Yes.
>
> Q.  Did you come into this country at New York City around May 13th of 1982 as a lawful permanent resident?
>
> A.  Yes.
>
> Q.  Then later on October 1st of 1993 *were you convicted* in the Queens County New York Court *for first degree robbery* that was committed on July 30th of '93?
>
> A.  Yes.
>
> Q.  And, sir, do you *admit that during the commission of that first degree robbery that you were armed with a handgun*?
>
> A.  Yes.
>
> Q.  And, finally, do you admit that you were sentenced for that crime for a max – a minimum term of three years and four months to a maximum of ten years?
>
> A.  Yes.

*Id*. at 4:6–24 (emphasis added).  Note that Mr. Moncrieffe agreed that:  (1) he had been convicted of robbery in the first degree, but no specific subsection was mentioned; and (2) he had been armed with a "handgun," but not that he had pled guilty to being so armed.

The immigration judge then found that the INS had met its burden of proof as to Mr. Moncrieffe's deportability by "clear, convincing, and unequivocal evidence." *Id*. at 8:5–9. He determined that the defendant was deportable under: (1) section 241(a)(2)(A)(iii) of the Immigration and Nationality Act ("INA") for having been convicted of an aggravated felony; and (2) section 241(a)(2)(C) of the INA for a firearms violation, having admitted to using a firearm:

> [Q.] First of all, under Section 241(a)(2)(A)(iii) of the Immigration Act *you've been convicted of an aggravated felony which first degree robbery is*. Do you understand that?
>
> A. Yes.
>
> Q. You can be deported for that alone. Also, under Section 241(A)(2)(C) of the Immigration Act, *you have admitted to using a handgun so you may be deported for that*. That's a firearms violation under the Immigration Act. Do you understand that?
>
> A. Yes.
>
> Q. All right. I find that the government has sustained its burden of proof as to deportability in your case by clear, convincing, and unequivocal evidence.

*Id*. at 5:7–20 (emphasis added). Note that the immigration judge told defendant that the "first degree robbery" was "an aggravated felony" which, as explained below, was not clear and needed a defense counsel to explain. Defendant was also told that he had admitted to "*using* a handgun," when he had only agreed he had been "*armed* with a handgun." *See id*. at 4:18–20, 5:12–15 (emphasis added). What he had actually pleaded to was not analyzed at all.

The immigration judge then went on to assess whether any relief from deportation was available to Mr. Moncrieffe. *Id*. at 5:21–23. He asked "do you want to try to stay here or do you want to be deported back to Jamaica?" to which defendant answered "I want to go back *but I [want to] talk to my mom first*." *Id*. at 5:25–6:2 (emphasis added). At the time of the hearing, Mr. Moncrieffe's communications with his mother were limited; she had been involved in a car

accident and was still on life support. Rostal Decl., at ¶ 11; *see also* Hr'g Tr., Feb. 25, 2016, at 42:12–15. The statement "I [want to] talk to my mom first" suggested he had not yet waived the right to contest deportation.

The immigration judge told Mr. Moncrieffe that he "*ha[d] to go through with the proceedings* as if [Mr. Moncrieffe] wanted to stay here." Rostal Decl., Ex. A, at 6:3–6 (emphasis added). He asked defendant how old he was, whether he was single or married, and whether his mother who lived in the United States was a United States citizen. *Id*. at 6:8–22. To this last question, Mr. Moncrieffe replied "I don't know. I don't think so." *Id*. at 6:23. The government attorney noted that "[a]s of October 5, 1994, the latest we have, she was a lawful permanent resident and not a United States citizen." *Id*. at 7:2–4.

> Q. […] I have to go through the proceedings as if you wanted to stay here so in other words I've got to go through the rest of this proceeding the same way as if you wanted to fight to stay here, okay. You understand that part of it?
>
> A. Yes.
>
> Q. […] First of all, I want to know how old you are?
>
> A. Nineteen.
>
> Q. Nineteen now?
>
> A. Yeah.
>
> Q. Okay. Single or married?
>
> A. Single.
>
> Q. Okay. Mother and father still living?
>
> A. Yes.
>
> Q. Where do they live?
>
> A. My mother live here. My father live in Jamaica.
>
> Q. Okay. Is your mother a green card holder?

A. Yes.  She married too.

Q.  Okay.  But she's a lawful permanent resident.  She's not a U.S. citizen, right?

A. I don't know.  I don't think so.

JUDGE TO MR. MUNJACK

Q.  What does your file show, Mr. Munjack, as to his mother? Anything?

A. It shows that she's a lawful permanent resident, Your Honor.  As of October 5, 1994, the latest we have, she was a lawful permanent resident and not a United States citizen.

*Id*. at 6:3–7:4.

The immigration judge then concluded that there was *no relief* available to Mr. Moncrieffe.

*Id*. at 7:14–16.  He explained that because he had found that defendant had been convicted of a

gun violation, defendant could not stay in the United States:

> [T]he only reason I'm asking you these questions is because you have a gun violation – *gun charge that you've been convicted of*. And the Federal Immigration law says that *if you have a gun charge violation against you in immigration proceedings that you can't stay here in this country* unless you have a wife and you're single. . . . [O]r a mother and a father or a father who are United States citizens could file a petition for you which would waive that gun charge. You don't have that.  *So I find that there is no relief available for you and I could not let you stay in this country even if I wanted to.*

*Id*. at 7:6–16 (emphasis added).  An attorney would not have accepted so cavalier a description of

defendant's legal position.

The judge told defendant that he could get no relief from the forthcoming order of

deportation:

> I find that the government sustains the burden of proof by clear, convincing, and unequivocal evidence as to deportability.  *I find also that there is no relief in your case.*  You're not qualified for adjustment of status in this case and so I'm going to order you deported to Jamaica.

*Id.* at 8:5–9 (emphasis added).

Finally, the immigration judge inquired if Mr. Moncrieffe wished to appeal his decision. *See id.* at 9:5. Again, Mr. Moncrieffe indicated that he wished to consult his mother before making a decision: "Um—well, *talk to my mother and see what she going to say*. I might appeal." *Id.* at 9:6–7 (emphasis added).

Defendant subsequently confirmed that he did wish to appeal, and the immigration judge explained the purpose of an appeal: "[W]hat you appeal for is to *tell them that the judge made an error and you tell them what it was* and you then try to hope that they will overturn my decision and give you a new hearing or whatever." *Id.* at 10:5–8 (emphasis added). Defendant was reminded of the deadline for the timely filing of an appeal. *Id.* at 10:18–20. He still had no attorney. He was given no clue as to how he might get an attorney or what was a possible error of the administrative judge.

### 2. Board of Immigration Appeals

The notice of appeal filed by Mr. Moncrieffe is missing from the record. So the nature of the appeal and the issues raised by defendant cannot now be determined. The parties agree that the opinions of the BIA indicate that the appeal was timely filed by defendant *pro se*. *See* Rostal Decl., at ¶ 14; Gov't Opp'n Mem., at 8, n.3.

### a. Remand to Immigration Judge

On June 9, 1995, the BIA determined that the "record of the proceedings in this case does not reveal a certified copy of the conviction record." Rostal Decl., Ex. B, BIA Decision of Jun. 9, 1995, at SM000062. It remanded to the office of the immigration judge "for inclusion of the record of conviction:"

> PER CURIAM. This matter comes before us by way of the respondent's appeal of the Immigration Judge's decision dated February 9, 1995, finding the respondent deportable as charged, and

11

> statutorily ineligible for any form of relief from deportation. *The respondent was convicted in the New York State Supreme [Court] on October 1, 1993, for the offense of first degree robbery, in violation of section 160.15* of the New York State Penal Law. It is *alleged that the respondent was armed with a handgun* in the course of committing the offense, for which he was sentenced to an indeterminate span of three to ten years incarceration.
>
> Our review of the record of proceedings in this case *does not reveal a certified copy of the conviction record*. Therefore, *we cannot determine the respondent's eligibility for relief from deportation*. The record is hereby remanded to the office of the Immigration Judge for inclusion of the record of conviction.

*Id.* (emphasis added). There was, and still is, no certified copy of the plea, so we do not know whether the defendant pled to a specific subsection, and, as indicated below, in the instant criminal case it must be assumed that he did not plead to a specific subsection of section 160.15 because there is no evidence that he did so.

### b. Immigration Judge Decision Affirmed

The second BIA opinion, dated October 24, 1995, indicates that "the documentation has now been provided and the record has been returned to us for adjudication of the respondent's appeal." *Id.*, Ex. B, BIA Decision of Oct. 24, 1995, at SM000058. Here, the BIA affirmed the immigration judge's decision. *Id.*

*First*, it found that Mr. Moncrieffe's robbery conviction was for an "aggravated felony," making him deportable under former INA section 241(a)(2)(A)(iii):

> Inasmuch *as the respondent's first-degree robbery conviction was for a "crime of violence"* for which the term of imprisonment imposed was at least 5 years, and given that both his criminal conduct occurred and his conviction was entered in 1993, we find that *he has been convicted of an "aggravated felony"* for purposes of section 101(a)(43)(F) of the Act.

*Id.* at SM000059 (emphasis added).

*Second*, with respect to whether the defendant was also deportable as a non-citizen convicted of a firearms violation, the BIA noted that "[t]he judgment of conviction included in the *record indicates only that the respondent was convicted of robbery in the first degree*." *Id.* (emphasis added). The BIA recognized that only subsections (2) and (4) of section 160.15 "relate[d] in any way to the use, possession, or the carrying of a firearm." *Id.* at SM000060. Because section 241(a)(2)(C) of the INA "is predicated in pertinent part upon a conviction for using, owning, possession, or carrying a firearm in violation of any law," the BIA noted that in order to be deportable the defendant "*would have had to have been convicted under either subsection 2 or 4* of section 160.15 of the New York Penal Law." *Id.* (emphasis added). The BIA explained:

> It is apparent that only subsections 2 and 4 of section 160.15 relate in any way to the use, possession, or the carrying of a firearm. Hence, *in order to be deportable under section 241(a)(2)(C) of the Act*, which subsection is *predicated* in pertinent part upon a *conviction for using, owning, possession, or carrying a firearm* in violation of any law, the *respondent would have had to have been convicted under either subsection 2 or 4 of section 160.15* of the New York Penal Law.
>
> As noted above, *the judgment of conviction does not specify the subsection of section 160.15* or the specific count under which the respondent was convicted.

*Id.* (emphasis added).

Although the BIA acknowledged that the judgment of conviction did not specify under which subsection Mr. Moncrieffe was convicted, *it assumed* that the conviction was under subsection (2) *or* (4) of New York Penal Law section 160.15:

> [T]he criminal indictment supporting the conviction establishes that the respondent was charged with a total of two counts of robbery in the first degree, one under subsection 2 and the other under subsection 4. *Hence it can be inferred that the respondent's conviction for robbery in the first degree was premised on one of these two subsections.* Furthermore we note that count one of the

> indictment states that "the defendants [including therefore the respondent] were armed with a deadly weapon to wit: a handgun." Additionally, we observe that at his deportation hearing, *the respondent himself admitted that during the commission of the robbery he was armed with a handgun . . . . Based on this evidence, we find that the respondent's conviction for robbery in the first degree is correctly viewed as also being a conviction for a firearms violation for purposes of the immigration law*.

*Id*. (emphasis added). Based on its assumptions, unsupported by the record, the BIA concluded that Mr. Moncrieffe was convicted of a firearms offense and deportable under former section 241(a)(2)(C) of the INA. *Id*.

### c. Relief from Deportation

The BIA then turned to whether the defendant qualified for any relief from deportation, "given that he has been a lawful permanent resident of the United States for over 13 years." *Id*. According to the BIA, "relief is available in deportation proceedings only to those aliens who have been found deportable under a ground of deportability *for which there is a comparable ground of excludability*." *Id*. at SM000061 (emphasis added). It then concluded:

> Inasmuch as the respondent is deportable under section 241(a)(2)(C) of the Act, a section having no counterpart among the enumerated grounds of exclusion, *he is ineligible as a matter of law* for relief under section 212(c) of the Act, notwithstanding the fact that he has resided in this country for the past 13 years as a lawful permanent resident.

*Id*. (emphasis added).

The BIA noted that the defendant "*might be able to establish his eligibility for adjustment of status based on his relationship to his lawful permanent resident mother*." *Id*. (emphasis added). Yet, "*[t]here is no indication from the record . . . that the respondent's mother has actually petitioned* his admission by filing a visa petition on his behalf." *Id*. (emphasis added). It explained:

> It is conceivable that the respondent might be able to establish his eligibility for adjustment of status based on his relationship to his lawful permanent resident mother. There is *no indication from the*

> *record*, however, that the respondent's mother has actually
> petitioned his admission by filing a visa petition in his behalf. Even
> assuming that such a petition had been filed and approved, the
> respondent cannot establish, as he must for adjustment purposes,
> that an immigrant visa is immediately available to him. Therefore
> he cannot demonstrate, even preliminarily, his eligibility for
> adjustment of status.

*Id.* (emphasis added).

It will be recalled that the mother at the moment was seriously debilitated from an auto accident and that defendant had no attorney. *See supra* Part II.E.1. How could he possibly make the required record without counsel? The BIA also determined that, based on his "aggravated felony conviction," Mr. Moncrieffe was "ineligible for suspension of deportation because he [was] precluded as a matter of law from establishing his good moral character . . . ." Rostal Decl., Ex. B, BIA Decision of Oct. 24, 1995, at SM000061. The BIA concluded:

> Since the respondent is deportable as charged and there appears to
> be no relief from deportation for which he might qualify
> *notwithstanding the favorable factors now enunciated, we have no*
> *choice but to dismiss the appeal*. Accordingly, the appeal is
> dismissed.

*Id.* (emphasis added). In short, defendant's "favorable factors" were never considered.

### 3. Deportation

Mr. Moncrieffe served his term for his 1993 conviction. *See* Rostal Decl., at ¶ 16. He was paroled to immigration custody on July 28, 1999. *Id.* He was deported to Jamaica on August 18, 1999. Rostal Decl., Ex. E, Case Closure Look Screen, Feb. 20, 2002 ("Ex. E"). No direct appeal or habeas relief was sought by defendant between the time of the BIA's ruling and his deportation. He still had no attorney.

### F. Return to United States

Subsequent to his deportation, Mr. Moncrieffe returned to the United States and lived with his family up until the time of his arrest and the criminal indictment in the instant case. Rostal

Decl., at ¶ 17. Since his return, Mr. Moncrieffe has not been found guilty of any other criminal offense. *See id.*; *see also* Hr'g Tr., Feb. 25, 2016 (indicating the presence of persons supportive of defendant at the hearing before this court on the instant motion).

Defendant's family, friends, clients, and fellow church members attest to his full rehabilitation. Rostal Decl., Ex. C, S. Moncrieffe Character References ("Ex. C"). He has obtained a General Educational Development diploma ("GED") and followed a career in landscaping, construction and carpentry, successfully opening his own business. Rostal Decl., at ¶ 17. He is a member of the St. Albans Congregational Church in Queens, where he sings in two choirs and participates in the church's ministries. *Id.* He has been characterized as a "role model" for community youth. Rostal Decl., Ex. C.

### G. Arrest and Indictment in Instant Case

About April 13, 2015, Mr. Moncrieffe was arrested by the New York City Police Department ("NYPD") for unlicensed operation of a motor vehicle, in violation of New York Vehicle and Traffic Law section 509. *See* Compl., July 17, 2015, ECF No. 1 ("Compl."), at ¶ 2. United States Immigration and Customs Enforcement ("ICE") was notified of the arrest. *Id.* at ¶ 3. That arrest is not the basis for the current federal criminal charge.

On July 29, 2015 Mr. Moncrieffe was indicted for an illegal reentry. *See* Indictment, July 29, 2015, ECF No. 5. Charged was that Mr. Moncrieffe, a non-citizen "who had previously been deported from the United States after a conviction for the commission of an aggravated felony, was found in the United States, without the Secretary of the United States Department of Homeland Security having expressly consented to such alien's applying for admission." *See* 8 U.S.C. §§ 1326(a), 1326(b)(2) and 18 U.S.C. § 3551 *et seq*; Indictment, July 29, 2015, ECF No. 5. Implied in the indictment is that he had been "*properly* deported."

**III.    Defendant's Motion to Dismiss Indictment**

Defendant filed a motion to dismiss the indictment on December 16, 2015.  *See* Def.'s Mot. to Dismiss Indictment, Dec. 16, 2015, ECF No. 24 ("Def.'s Mot. to Dismiss").  Contended is that the deportation following his 1993 robbery conviction was procedurally unfair and obtained in violation of immigration law and due process; thus, it could not serve as the basis for an illegal reentry prosecution under section 1326(d) of Title 8 of the United States Code.  *See id.*  According to Mr. Moncrieffe, he is entitled to challenge the validity of the deportation order on which his illegal reentry charges are based because he satisfies the elements of section 1326(d) in that: (1) he exhausted "any administrative remedies that may have been available to seek relief against the order"; (2) his deportation proceedings "improperly deprived [him] of the opportunity for judicial review"; and (3) "entry of the order was fundamentally unfair."  *See id.* at 2; *see also* 8 U.S.C. § 1326(d).

The government opposes the motion, arguing that Mr. Moncrieffe has failed to satisfy the second and third prongs of section 1326(d) because: (1) judicial review was available to him in the form of an appeal to the Court of Appeals for the Second Circuit or a habeas challenge, but he failed to pursue either avenue; and (2) the proceedings were not fundamentally unfair because the BIA "reviewed his appeal consistent with the law at the time and new legal principles cannot be applied to already closed cases . . . ."  Gov't Opp'n Mem., at 2.

**IV.    Law**

**A.  Illegal Reentry**

Section 1326(a) of Title 8 of the United States Code makes it a crime for a deported non-citizen to enter, attempt to enter, or be found in the United States without the express consent of the Attorney General:

(a) In general

Subject to subsection (b) of this section, any alien who--

(1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter

(2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,

shall be fined under Title 18, or imprisoned not more than 2 years, or both.

8 U.S.C. § 1326(a).

Because a prior valid deportation order is an element of an illegal reentry offense, a defendant charged under section 1326(a) may collaterally attack the validity of the prior deportation order and proceedings. *United States v. Mendoza–Lopez*, 481 U.S. 828, 836–39 (1987); *see also United States v. Gonzalez–Roque*, 301 F.3d 39, 45 (2d Cir. 2002); *United States v. Calderon*, No. 02-CR-0691, 2003 WL 1338943, at *4 (E.D.N.Y. Jan. 9, 2003) *aff'd*, 391 F.3d 370 (2d Cir. 2004); *United States v. Gill*, 748 F.3d 491, 493, 497 (2014).

Deportation proceedings are not valid and cannot be used to establish prior deportation for purposes of an illegal reentry criminal prosecution if they failed to comply with the requirements of due process. *See, e.g.*, *Mendoza–Lopez*, 481 U.S. at 837–41; *United States v. Fernandez–Antonia*, 278 F.3d 150, 156 (2d Cir. 2002); *Calderon*, 2003 WL 1338943 at *4.

## B. Collateral Challenge to Prior Deportation Order

A non-citizen charged with illegal reentry in violation of section 1326 may challenge *nunc pro tunc* the underlying order of removal or deportation on limited grounds, as provided for under section 1326(d):

In a criminal proceeding under this section, an alien may not challenge the validity of the deportation order described in subsection (a)(1) of this section or subsection (b) of this section unless the alien demonstrates that--

(1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;

(2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and

(3) the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d). A defendant must establish all three prongs in section 1326(d). *See Fernandez-Antonia*, 278 F. 3d at 157.

### 1. Exhaustion of Remedies

Exhaustion of administrative remedies generally—but not always—requires a non-citizen to appeal the order of an immigration judge to the BIA. *See Calderon*, 2003 WL 1338943 at *4; *see also U.S. v. Lopez*, 445 F.3d 90, 93 (2d Cir. 2006).

### 2. Opportunity for Judicial Review

In *Mendoza–Lopez*, subsequently codified in section 1326 of Title 8, the Supreme Court held that "where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be *some* meaningful review of the administrative proceeding." *Mendoza–Lopez*, 481 U.S. at 837–38 (emphasis in original). Due process is violated when a non-citizen is "effectively deprived" of the right to a direct appeal; an unconsidered and unintelligent waiver of appeal rights is treated as a deprivation of those rights. *See id*. at 840 (finding that because "the waivers of their rights to appeal were not considered or intelligent, respondents were deprived of judicial review of their deportation proceeding"); *see also United States v. Perez*, 213 F. Supp. 2d 229, 232 (E.D.N.Y. 2002) *aff'd*, 330 F.3d 97 (2d Cir. 2003) (citing *United States v. Paredes–Batista*, 140 F.3d 367, 376 (2d Cir. 1998)).

Waivers are not "considered" or "intelligent" if the immigration judge and counsel fail to inform the non-citizen of his right to discretionary relief.  *See Mendoza–Lopez*, 481 U.S. at 840 (waiver was not considered and intelligent when immigration judge "failed to advise respondents properly of their eligibility to apply for suspension of deportation"); *United States v. Calderon*, 391 F. 3d 370 (2d Cir. 2004) (finding that defendant was deprived of a realistic opportunity for judicial review where he "was specifically told that no such review was available to him"); *United States v. Sosa*, 387 F.3d 131, 138 (2d Cir. 2004) ("Given the speed of this process and the fact that the [immigration judge] did not inform Sosa of his eligibility for Section 212(c) relief, we hold that he had no 'realistic opportunity for judicial review by way of habeas.'") (internal citation omitted); *see also United States v. Arrieta*, 224 F.3d 1076, 1079 (9th Cir. 2000) ("an alien who is not made aware that he has a right to seek relief necessarily has no meaningful opportunity to appeal the fact that he was not advised of that right.").

In *Perez*, the court identified instances in which a deprivation of due process had been found.  These included failure to advise meaningfully of the right to appeal, failure to explain the possibility of discretionary relief, inadequate explanation of other methods of avoiding deportation, and ineffective counsel:

> Situations in which courts have found a deprivation of the opportunity for review include an unconsidered and unintelligent waiver of appeal, *Mendoza–Lopez*, 481 U.S. at 840, 107 S.Ct. 2148, 95 L.Ed.2d 772; failure to advise of the availability of discretionary relief, *United States v. Arrieta*, 224 F.3d 1076, 1079 (9th Cir. 2000); *United States v. Aguirre–Tello*, 181 F. Supp. 2d 1298, 1303–1304 (D.N.M. 2002); inadequate explanation of a section 212(c) hearing and such a hearing's accompanying rights, *United States v. Sanchez–Peralta*, 1998 WL 63405, at *5 (S.D.N.Y. Feb.13, 1998); and failure to inform the alien of the time and date of a hearing, *United States v. Montano–Betancourt*, 151 F. Supp. 2d 794, 796–97 (W.D. Tex. 2001). . . . Deprivation of judicial review can also be established by demonstrating ineffective assistance of counsel.

*Perez*, 213 F. Supp. 2d at 232–33.  Under circumstances such as the present one, lack of counsel may be considered even more important evidence of an improper deportation process than ineffective counsel.

The availability of habeas review sometimes amounts to an opportunity for judicial review. *United States v. Copeland*, 376 F.3d 61, 68 (2d Cir. 2004).  In *Copeland*, the Court of Appeals for the Second Circuit held that "where habeas review is technically available, judicial review will be deemed to have been denied if resort to a habeas proceeding was *not realistically possible*."  *Id.* (emphasis added).  The court concluded that "where no realistic opportunity for judicial review by way of habeas review existed, an alien's failure to seek such review will not be deemed to preclude a collateral attack on a deportation order under Section 1326(d)(2)."  *Id.* at 68–69; *see also Calderon*, 391 F.3d at 374–75.

A lack of a realistic opportunity for judicial review has been found in instances where: a non-citizen's waiver of the right of appeal was not deemed to be knowing and intelligent, *see, e.g.*, *Copeland*, 376 F.3d at 68–69 (citing *Mendoza-Lopez*, 481 U.S. at 836–37, 840); a non-citizen was affirmatively misled by the government as to the availability of relief, *see, e.g.*, *Lopez*, 445 F.3d at 98–99; and the immigration judge did not adequately inform the non-citizen of his eligibility for relief under section 212(c), *see, e.g.*, *Sosa*, 387 F.3d at 138; *Calderon*, 391 F.3d at 375–76.

Given this broad and deep due process protection, telling an uncounseled young man with limited education, who wants to obtain his mother's advice before deciding whether to appeal (when she is in fact unavailable) may in context be the equivalent of no notice of the right to appeal.

Although "there is a strong policy in favor of finality, that policy does not override an individual's right to due process in a proceeding whose outcome is being asserted as an element of a criminal offense." *Calderon*, 2003 WL 1338943 at *6.

### 3. Unfairness of Deportation Order

To demonstrate that a deportation order was fundamentally unfair, a defendant "must show both a fundamental procedural error and prejudice resulting from that error." *See United States v. Perez*, 330 F.3d 97, 104 (2d Cir. 2003) (citing *Fernandez-Antonia*, 278 F.3d at 159). "Prejudice is shown where there is a reasonable probability that, but for the error, the result of the proceeding would have been different." *United States v. Daley*, 702 F.3d 96, 100 (2d Cir. 2012) (alterations and citations omitted); *see also Copeland*, 376 F. 3d at 70 ("[I]n order to demonstrate prejudice an alien must show that this proceedings contained errors so fundamental that he might have been deported in error.") (internal citation and quotation omitted).

## V. Application of Law to Facts

### A. Defendant Exhausted Administrative Remedies

Mr. Moncrieffe contends that he satisfied the administrative exhaustion requirement of section 1326(d) in two ways: (1) through his BIA appeal; and (2) by his being affirmatively misled as to deportability and the availability of relief from deportation. The government has not objected to this view.

Mr. Moncrieffe timely appealed his deportation order to the BIA. This alone satisfies the exhaustion requirement of section 1326(d)(1).

He was repeatedly mistakenly told by the immigration judge and the BIA that further relief, including section 212(c) relief, was not available to him. Thus, his subsequent failure to seek section 212(c) relief does not bar collateral review of the deportation proceedings. *See Calderon*,

391 F.3d at 375 (excusing defendant from the exhaustion requirement where he did not seek section 212(c) relief "because he was advised that he was barred by law from such relief").

### B. Defendant Denied Opportunity for Judicial Review

Mr. Moncrieffe asserts that he was wrongly told by the immigration judge and the BIA that his 1993 robbery conviction rendered him deportable with no possibility of relief. He argues that, as a *pro se* litigant, his failure to seek judicial review of the BIA's ruling was not a knowing and intelligent waiver of his right to court review. *See* Def.'s Mot. to Dismiss, at 11. The government counters that both the immigration judge and the BIA preserved defendant's ability to seek judicial relief and that Mr. Moncrieffe: (1) failed to file a petition to review to the Court of Appeals for the Second Circuit following the BIA's order confirming his deportation; and (2) did not file a habeas petition in the four years between the BIA's decision and his deportation. *See* Gov't Opp'n Mem., at 14–15.

The Court of Appeals for the Second Circuit has recognized that where "no *realistic opportunity*" for judicial review exists, a non-citizen's failure to seek such review will not bar a section 1326(d) collateral challenge to the underlying deportation. *See, e.g.*, *Calderon*, 391 F.3d at 375 (emphasis added); *Copeland*, 376 F.3d at 68–69. No such opportunity exists where an uncounseled non-citizen is affirmatively told by the immigration authorities that no relief is available to him. *See, e.g.*, *Mendoza-Lopez*, 481 U.S. at 836–37, 840 (determining that "respondents were deprived of their rights to appeal, and of any basis to appeal since the only relief for which they would have been eligible was not adequately explained to them"); *Calderon*, 391 F.3d at 375–76 (finding no realistic opportunity for judicial review where the defendant was specifically told that section 212(c) relief was unavailable to him as a matter of law and the speed of the deportation process rendered judicial review impracticable); *Sosa*, 387 F.3d at 138 (holding that defendant had no realistic opportunity for judicial review due to "the speed of th[e] process

and the fact that the [immigration judge] did not inform [him] of his eligibility for Section 212(c) relief"); *Lopez*, 445 F.3d at 100 ("[T]he [immigration judge's] and BIA's . . . affirmative misstatements to [the non-citizen] that he was not eligible for any relief from deportation *functioned as a deterrent to seeking relief*.") (emphasis added).

Here, Mr. Moncrieffe—a young nineteen year old with limited education—appeared *pro se* before the immigration judge and then the BIA. At the immigration proceedings, he indicated his intention to obtain a lawyer "later on," as well as his desire to discuss the matter with his mother, who was on life support at the time, before making any critical decision that might affect his ability to remain in the United States. *See* Rostal Decl., Ex. A, at 2:13, 9:6–7. Alone and uncounseled, he was told by the immigration judge that, because he had "a gun charge violation, . . . no relief is available for you and I could not let you stay in this country even if I wanted to." *Id.* at 7:11–16. The immigration judge had erroneously based his decision on a determination, without supporting evidence, that Mr. Moncrieffe had pled guilty to "a gun charge violation." *See infra* Part V.C.1. The BIA then mistakenly reiterated that, because he was convicted of a "firearms offense," Mr. Moncrieffe was ineligible for section 212(c) relief "as a matter of law." Rostal Decl., Ex. B, BIA Decision of Oct. 24, 1995, at SM000061; *see also infra* Part V.C.1.

Like the defendant in *Lopez*, Mr. Moncrieffe "received erroneous information from the [immigration judge] and the BIA about the availability of relief from deportation." *Lopez*, 445 F.3d at 98. Recognized by the court in that case is that,

> [h]ad the [immigration judge] (and subsequently the BIA) not provided erroneous information . . . about the legal availability of § 212(c) relief, it might have occurred to [defendant] to look for other remedies at law. *The fact that an administrative body told him that no such relief existed is a powerful deterrent from seeking judicial relief.*

*Id.* (emphasis added).

As in *Lopez*, the interval of time between Mr. Moncrieffe's deportation order and his actual deportation is not relevant here. *Id.* at 99 ("While the interval of time in which it is realistically possible for an alien to seek judicial review may be quite short where the alien has not received misinformation, the analysis differs where the government affirmatively misleads an alien about the availability of relief."). Mr. Moncrieffe was erroneously told by the immigration judge and the BIA that no relief was available to him as a matter of law. "Waivers [of the right to judicial review] are not fully informed if the immigration judge . . . fail[s] to inform the alien of his right to discretionary relief." *Calderon*, 2003 WL 1338943 at *5. The Court of Appeals for the Second Circuit has firmly ruled,

> [g]iven that [immigration judges] have a duty to develop the administrative record, and that many aliens are uncounseled, *our removal system relies on [immigration judges] to explain the law accurately to pro se aliens. Otherwise, such aliens* would have no way of knowing what information was relevant to their cases and *would be practically foreclosed from making a case against removal.*

*Copeland*, 376 F.3d at 61, 71 (emphasis added).

Mr. Moncrieffe was an uncounseled immigrant, and a youthful, poorly educated, nineteen year old as well. In light of the repeated statements by immigration authorities that no further relief was available to him, his failure to seek judicial review following his BIA appeal is not a bar to a collateral attack on his deportation.

### C. Deportation Order Fundamentally Unfair

Defendant argues that the deportation order was fundamentally unfair because: (1) both the immigration judge and the BIA misapplied the categorical approach to determine whether the record supported the two separate charges of removability; and (2) the BIA denied Mr. Moncrieffe relief under section 212(c) based on the "comparable ground rule" which has been struck down by

the Supreme Court as "arbitrary and capricious." *See* Def.'s Mot. to Dismiss, at 12 (citing *Judulang v. Holder*, 132 S. Ct. 476 (2011)).

### 1. Misapplication of Categorical Approach

According to defendant, the immigration judge and BIA misapplied the appropriate categorical approach in determining that he was deportable as charged. The Supreme Court has explained: "[w]hen the Government alleges that a state conviction qualifies as an 'aggravated felony' under the INA, we generally employ a 'categorical approach' to determine whether the state offense is comparable to an offense listed in the INA." *Moncrieffe v. Holder*, 133 S. Ct. 1678, 1684 (2013) (citations omitted). The categorical approach had been adopted by the Supreme Court and was being utilized by the BIA for several years prior to Mr. Moncrieffe's case. *See Taylor v. United States*, 495 U.S. 575 (1990); *Moncrieffe*, 133 S. Ct. at 1685 (stating that "[t]his categorical approach has a long pedigree in our Nation's immigration law" and citing Das, The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law, 86 N.Y.U. L. Rev. 1669, 1688–1702, 1749–1752 (2011) (tracing judicial decisions back to 1913)). It is not disputed that the categorical approach is applicable in the instant case. *See* Hr'g Tr., Feb. 25, 2016, at 11:20–22.

Central to the categorical approach is the rule that the crime of conviction is defined by the applicable statute; the underlying actual conduct of the defendant is immaterial. "[T]he INA asks what offense the noncitizen was *convicted of not what acts he committed*. [C]onviction is the relevant statutory hook." *Moncrieffe*, 133 S. Ct. at 1685 (internal citations and quotation marks omitted) (emphasis added).

Analysis under the categorical approach requires determining whether "the state statute defining the crime of conviction categorically fits within the generic federal definition of a corresponding aggravated felony." *Id.* at 1684 (citing *Gonzales v. Duenas–Alvarez*, 549 U.S. 183,

186 (2007)) (internal quotation marks omitted). The analysis does not center on "the facts of the particular prior case." *Id*. Instead, "a state offense is a categorical match with a generic federal offense *only if* a conviction of the state offense necessarily involved . . . facts equating to [the] generic [federal offense]. *Whether the noncitizen's actual conduct involved such facts is quite irrelevant*." *Id*. (internal quotation marks and citations omitted) (emphasis added).

The Supreme Court explained that the categorical approach requires a minimum conduct analysis: "[b]ecause we examine what the state conviction necessarily involved, not the facts underlying the case, *we must presume that the conviction 'rested upon [nothing] more than the least of th[e] acts' criminalized*, and then determine whether even those acts are encompassed by the generic federal offense." *Id*. (citing *Johnson v. United States*, 559 U.S. 133, 137 (2010)) (emphasis added). Also irrelevant is what the defendant-deportee said he had done, or what an immigration judge inferred was done.

A hypothetical case clarifies the rule: Assume a federal statute provides that a state conviction can be used as if it were a prior conviction in federal sentencing if it has the same or more severe operative elements than the federal statute. The state statute, "A," requires stealing over $10.00. The federal statute, "B," requires stealing over $20.00. The defendant is charged as follows in the state under its statute, "A": "Defendant stole $100, to wit a $100 gold United States government issued coin." And the defendant pled: "I plead guilty to violation of statute A. I stole this $100 gold coin, marked exhibit 1." That is not a prior congruent categorical crime under federal statute "B," because the defendant pled only to stealing $10.00, while the federal statute required $20.00 or more.

Mr. Moncrieffe properly contends that because the record from his 1993 conviction of violating section 160.15 fails to specify what subsection of that section he was convicted of, and

some subsections did not define a deportable offense, it was insufficient as a matter of law to establish that his conviction amounted to (1) a "crime of violence" and thus an "aggravated felony" under former INA section 241(a)(2)(A)(iii); and (2) a "firearms" offense subjecting him to removability under former INA section 241(a)(2)(C).

### a. Aggravated Felony

Under then-applicable INA section 241(a)(2)(A)(iii), an aggravated felony triggering removal proceedings could be found if the offense amounted to a "crime of violence." *See* INA § 101(a)(43)(F), 8 U.S.C. § 1101(a)(43)(F) (1994) (cross-referencing 18 U.S.C. § 16). A crime of violence was, and still is, defined by section 16 of Title 18 of the United States Code,

> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16.

The parties stipulated on the record that, because the immigration authorities only relied on subsection 16(a) in their analysis, subsection 16(b) is not relevant to the present motion. It will not be considered here. *See* Hr'g Tr., Feb. 25, 2016, at 9:14–10:4.

### i. General Rule

Under the applicable categorical approach, the immigration judge and BIA need to compare the state elements of the offense of defendant's conviction with the elements of the federal "crime of violence" under section 16. Because the immigration judge and BIA did not rely on the elements of the actual offense of which Mr. Moncrieffe was convicted in determining that he was convicted of "a crime of violence," it is accurately contended by the defendant that the conclusion reached by the immigration authorities was erroneous.

Mr. Moncrieffe was convicted of robbery in the first degree under New York Penal Law section 160.15, which provides various methods by which the crime could be committed as follows:

> A person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, *he or another participant in the crime*:
>
> 1. Causes serious physical injury to any person who is not a participant in the crime; or
>
> 2. Is armed with a deadly weapon; or
>
> 3. Uses or threatens the immediate use of a dangerous instrument; or
>
> 4. Displays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; except that in any prosecution under this subdivision, *it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a loaded weapon* from which a shot, readily capable of producing death or other serious physical injury, could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime.

N.Y. Penal Law § 160.15 (emphasis added).

Neither the immigration judge nor the BIA addressed the specific elements of Mr. Moncrieffe's conviction. While the BIA recognized that "the judgment of conviction does not specify the subsection of section 160.15 or the specific count under which the respondent was convicted," it nonetheless determined that:

> Inasmuch as *the respondent's first-degree robbery conviction was for a "crime of violence"* for which the term of imprisonment imposed was at least 5 years, and given that both his criminal conduct occurred and his conviction was entered in 1993, we find that he has been convicted of an "aggravated felony" for purposes of section 101(a)(43)(F) of the Act.

Rostal Decl., Ex. B, BIA Decision of Oct. 24, 1995, at SM000059–60 (emphasis added).

This conclusory and unsupported statement does not comport with the strict requirements of a categorical analysis. The categorical approach requires a narrow and precise comparison of the actual statute of conviction to the federal definition of a corresponding aggravated felony. Prohibited is any reliance on the names or captions of the predicate state offense, as well as on the underlying facts of conviction.

Because neither the immigration judge nor the BIA carried out the appropriate analysis required under the categorical approach, the finding that Mr. Moncrieffe's conviction amounted to a deportable "aggravated felony" was improper.

The government counters that "any robbery, no matter the nature of it, is a violent felony." Hr'g Tr., Feb. 25, 2016, at 21:21–24. According to the government, "forcibly stealing" is an essential element of any conviction under section 160.15 and this element on its own satisfies the "crime of violence" definition in federal section 16(a). *See* Gov't. Opp'n Mem., at 17–18.

Under the categorical approach, a court is to assume that a "conviction 'rested upon [nothing] more than *the least of th[e] acts' criminalized*, and then determine whether even those acts are encompassed by the generic federal offense." *Moncrieffe*, 133 S. Ct. at 1681 (citing *Johnson v. United States*, 559 U.S. 133, 137 (2010)) (emphasis added).

"Forcibly stealing" is a common element of all New York robbery offenses. New York Penal Law section 160.00 provides that:

> A person forcibly steals property and commits robbery when, in the course of committing a larceny, he uses or *threatens the immediate use of physical force upon another person* for the purpose of:
>
> 1. *Preventing* or overcoming *resistance* to the taking of the property or to the *retention* thereof *immediately after the taking*; or
>
> 2. Compelling the owner of such property or another person to deliver up the property or to *engage in other conduct which aids in the commission of the larceny*.

N.Y. Penal Law § 160.00 (emphasis added).

New York courts have explained that the "physical force" threatened or employed can be minimal, including a bump, a brief tug-of-war over property, or even the minimal threatened force exerted in "blocking" someone from pursuit by simply standing in their way. *See, e.g.*, *People v. Lee*, 602 N.Y.S.2d 138, 139 (N.Y. App. Div. 1st Dep't 1993) (bumping victim); *People v. Bennett*, 631 N.Y.S.2d 834, 834 (N.Y. App. Div. 1st Dep't 1995) ("human wall" blocking pursuit); *People v. Patton*, 585 N.Y.S.2d 431, 431 (N.Y. App. Div. 1st Dep't 1992) (blocking pursuit); *People v. Safon*, 560 N.Y.S.2d 552, 552 (N.Y. App. Div. 4th Dep't 1990) (tug-of-war); *People v. Brown*, 663 N.Y.S.2d 539, 540 (N.Y. App. Div. 1st Dep't 1997) (attempting to push the victim); *People v. Pena*, 50 N.Y.2d 400, 407 n.2 (N.Y. 1980) (defendant who commits robbery while carrying a deadly weapon is guilty of robbery in the first degree; mere possession is sufficient for a conviction); *cf. United States v. Castleman*, 134 S. Ct. 1405, 1412 (2014) ("Minor uses of force may not constitute 'violence' in the generic sense. For example, in an opinion that we cited with approval in *Johnson,* the Seventh Circuit noted that it was hard to describe . . . as violence a squeeze of the arm [that] causes a bruise.") (internal quotation marks and citation omitted).

This is not disputed by the government:

> THE COURT: But any amount of force is okay under the New York statute, isn't it?
>
> MS. WASHINGTON: Yes.
>
> THE COURT: You jostle somebody to make that person drop a purse, for example, is that force?
>
> MS. WASHINGTON: For purposes of New York law, sure, yes.

Hr'g Tr., Feb. 25, 2016, at 20:24–21:5.

The government argues that because the language of New York Penal Law section 160.00 regarding the use or threat of physical force mirrors the language in section 16(a) of Title 18 of the

United States Code, this is sufficient to determine that any crime of robbery under New York law qualifies as a "violent felony," for immigration purposes, regardless of the amount of force used. *See* Hr'g Tr., Feb. 25, 2016, at 24:11–14, 25:7–25, 51:2–6. In support of its argument, the government cites to *United States v. Snype*, 441 F.3d 119 (2d Cir. 2006). In *Snype*, the Court of Appeals for the Second Circuit considered a defendant's challenge to his conviction and sentence. One of the issues raised was whether the "three strikes law" had been properly applied. In that context, the court determined that "the plain language of § 3559(c)(2)(F)(i) identifies any robbery in violation of § 2113, or an inchoate version of such a robbery—namely, attempt, conspiracy, or solicitation to commit the offense—as a serious violent felony." *Snype*, 441 F.3d at 144. It went on to explain that, *because the New York state robbery elements parallel those required to establish robbery under the United States Code*, New York state robbery convictions also qualified as serious violent felonies *under § 3559(c)(2)(F)(i)*. *Id.* (emphasis added).

Correctly noted by defendant in the instant case, the Second Circuit decision in *Snype* did not compare language to section 16 of Title 18 of the United States Code: "*Snype* held that New York robbery is a serious violent felony because it matches the term robbery, not because it matches the definition of a crime of violence for [i]mmigration purposes." Hr'g Tr., Feb. 25, 2016, at 49:8–11.

The categorical analysis in the instant case requires careful matching of the crime of conviction to the definition of "crime of violence" provided for in federal section 16(a). The "forcibly stealing" element of an offense under New York Penal Law section 160.15, which is defined in the State's section 160.00 and is common to all New York robbery offenses, includes *de minimis* levels of force which do not fall within the federal definition of a "crime of violence" in section 16(a). In *Johnson v. United States*, the Supreme Court interpreted virtual identical

language in the Armed Career Criminal Act ("ACCA") definition of a "violent felony." *See Johnson v. United States*, 559 U.S. 133 (2010). *Johnson* found that "the phrase 'physical force' means *violent* force—that is, force capable of causing physical pain or injury to another person." *Id*. at 140 (emphasis in original). In reaching that decision, the Court relied on its prior reasoning in *Leocal v. Ashcroft* where it specifically interpreted federal section 16 to apply to "a category of *violent*, active crimes":

> In construing both parts of § 16, we cannot forget that we ultimately are determining the meaning of the term "crime of violence." The ordinary meaning of this term, combined with § 16's emphasis on the use of physical force against another person (or the risk of having to use such force in committing a crime), *suggests a category of violent, active crimes* . . . .

*Leocal v. Ashcroft*, 543 U.S. 1, 11 (2004) (finding that a driving under the influence offense did not qualify as a "crime of violence" under 18 U.S.C. § 16) (emphasis added).

The BIA has recognized that the Supreme Court's decision in *Johnson* controls the interpretation of federal section 16(a). *See, e.g.*, *Matter of Velasquez*, 25 I&N Dec. 278, 283 (BIA 2010) ("[I]n regard to crimes against the person, we conclude that the 'physical force' necessary to establish that an offense is a 'crime of violence' for purposes of the Act must be 'violent' force, that is, force capable of causing physical pain or injury to another person."); *Matter of Guzman-Polanco*, 26 I&N Dec. 713, 715–16 (BIA 2016), Ct. Ex. 1 (stating that *Johnson* controls the BIA's interpretation of a crime of violence under 18 U.S.C. § 16).

Mr. Moncrieffe should not have been deemed convicted of a "crime of violence" simply because he was convicted under New York's section 160.15. The categorical approach requires an analysis of the "least of th[e] acts criminalized." *See Moncrieffe*, 133 S. Ct. at 1681. The minimum conduct under any grade or subsection of the New York robbery statute does not require violent physical force. In the colloquial phrase, violence under the federal statute occurs when

"push comes to shove."  A gentle push is enough under the state law, but not under federal law. This difference matters; "[t]his is a force required for a very serious thing, taking the person and depriving him of his ability to stay in the United States."  Hr'g Tr., Feb. 25, 2016, at 27:7–9 (court's statement).

The government argues that the validity of Mr. Moncrieffe's deportation cannot be assessed with reference to decisions made subsequent to his immigration proceedings.  But, as properly argued by defendant, this analysis is inapposite.  Mr. Moncrieffe has brought a challenge to a currently open criminal charge—illegal reentry—not a closed past offense.  The Second Circuit Court of Appeals has consistently considered such cases on the merits without limiting its analysis to the law prevailing at the time of deportation.  *See, e.g.*, *Copeland*, 376 F.3d 61 (2d Cir. 2004); *Gill*, 748 F.3d 491 (2d Cir. 2014); *Sosa*, 387 F.3d 131 (2d Cir. 2004).

In the alternative, the government contends that current Second Circuit law supports its position that robbery in the first degree in violation of New York Penal Law section 160.15 is a crime of violence under federal section 16(a).  *See* Government Letter re Second Circuit Law, Mar. 7, 2016, ECF No. 39.  It relies upon *United States v. Bennett*, 604 F. App'x 11 (2d Cir. 2015) a summary order in which the Court of Appeals for the Second Circuit affirmed the defendant's conviction of being a felon in possession of a firearm, and *United States v. Wiggan*, 530 F. App'x 51 (2d Cir. 2013), another summary order where the court affirmed the defendant's conviction for possession of ammunition by a convicted felon.  In both cases the court considered whether a fifteen year minimum sentence mandated by ACCA was appropriate, in light of the district courts' findings that the defendants' prior convictions amounted to "violent felonies" under "18 U.S.C. § 924(e)."  In *Bennett*, the court determined that the district court did not err in looking only to defendant's New York certificate of disposition and concluding that his conviction for attempted

robbery in the first degree in violation of New York Penal Law section 160.15 amounted to a violent felony under ACCA, because a "requisite element" of the crime was "the use, attempted use, or threatened use of physical force against the person of another."  *See Bennett*, 604 F. App'x at 15 (internal quotation marks and citations omitted).  In *Wiggan*, the court indicated that first degree robbery under Connecticut law falls within "the first prong of the definition of 'violent felony,' which covers offenses having 'as an element the use, attempted use, or threatened use of physical force against the person of another.'"  *Wiggan*, 530 F. App'x at 57 (internal citations omitted).

Neither of the cases cited by the government—*Bennett* and *Wiggan*—supports the government's analysis in the instant case.  *First*, both decisions are summary orders, which are not binding.  *See* 2d Cir. R. 32.1.1(a) ("Rulings by summary order do not have precedential effect.").  *Second*, neither case addressed the degree of force required under the relevant state and federal laws.

The government indicates that this question is currently being considered by the Court of Appeals for the Second Circuit in the case of *United States v. Jones*, Case No. 15-1518.  *See* Government Letter re Second Circuit Law, Mar. 7, 2016, ECF No. 39.  Presently on appeal in *Jones* is whether, following the Supreme Court's decision in *Johnson*, the New York crime of robbery can be considered a "crime of violence" for purposes of the United States Sentencing Guidelines career offender provisions.  *See* Brief for Appellee United States of America, *United States v. Jones*, Case No. 15-1518, Jan. 27, 2016, at 18–28; Reply Brief for Appellant Corey Jones, *United States v. Jones*, Case No. 15-1518, Feb. 17, 2016, at 2–7; USSG §§ 4B1.1–2.  That case has not been decided and does not control the instant case.

Both the immigration judge and the BIA failed to apply the requisite categorical approach; they summarily and incorrectly concluded that Mr. Moncrieffe was convicted of an "aggravated felony" simply because he pled guilty to a violation of New York State's section 160.15. The "physical force" required under the New York robbery statute can be minimal and does not need to amount to the necessary "violent force" under federal section 16(a). Mr. Moncrieffe was not convicted of a federal "crime of violence" because he pled guilty to a violation of New York State's section 160.15.

### ii. Special Problem of Interpretation of State Law by State Court

Integrating part of the laws of one jurisdiction with part of the laws of another—as is required in applying the categorical approach—often involves difficulties in obtaining a satisfactory fit and in determining congruency. The general rule, as noted in Part V.C.1.a.i above, requires that the state statute be laid alongside the federal statute with the language of the state statute precisely and narrowly construed. But, there is a lurking problem in the rule as so stated: what shall a federal court do when "reading" a state's statute already interpreted and given a life of its own by the state's courts. The same words are likely to have been given slightly different meanings by the courts of the two jurisdictions. Supposing, for example, the state's courts were to have construed the state statute as requiring a different amount of "violence" than the federal statute. This question poses an interesting dilemma.

In the present case it is easily resolved since the New York State courts require the "slightest force" rather than any form of "violent force," so the categorical approach must result in a favorable decision for defendant. The alternative situation of a state court's interpretation requiring a higher force or the same force as the applicable federal statute is interesting.

One approach would be to ask, "what did the defendant who pled in the state court think he was pleading to with respect to degree of force when he pled?"  This is a more subtle question than the mechanical one posed in *People v. Olah*, *infra* Part V.C.1.b.  A lawyer could give a reasonable answer since he or she would have presumably read the state cases.  The meaning attributed to the words by defendant, however, would be an amount of force less than that required by the federal statute if he in fact applied minimal force in committing the crime.  Perhaps the rule of lenity would apply.  In the present case the rule of lenity need not be turned to because the straightforward analysis of New York State decisions declaring the miniscule degree of force required by section 160.15 requires a finding for defendant on the categorical issue.  *See supra* Part V.C.1.a.i.

### b. Firearms Offense

Former section 241(a)(2)(C) of the INA, captioned "Certain firearm offenses," provided:

> Any alien who at any time after entry is convicted under any law of purchasing, selling, offering for sale, exchanging, using, owning, possessing, or carrying in violation of any law, any weapon, part, or accessory *which is a firearm or destructive device (as defined in section 921(a) of Title 18*) is deportable.

8 U.S.C. § 1251(a)(2)(C) (1994) (emphasis added).

Defendant argues that the BIA erroneously determined that Mr. Moncrieffe's conviction triggered the firearm offense as a reason for deportation.  Only two of the four subsections in section 160.15 could potentially prompt deportation under the firearms offense.  *See* N.Y. Penal Law § 160.15(2) ("armed with a deadly weapon") and § 160.15(4) ("Displays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm . . . .").  Yet, the record of conviction did not indicate which subsection Mr. Moncrieffe was convicted of.

On February 12, 2016, this court ordered the parties to produce "the transcript of the proceedings in which Mr. Moncrieffe pleaded guilty to the crime of Robbery in the First Degree

in violation of N.Y. Penal Law § 160.15." Order, Feb. 12, 2016, ECF No. 32. On February 24, 2016, the government confirmed that, despite diligent efforts, the Queens County Supreme Court "cannot locate in its courthouse facilities or archives the stenographic notes required to produce a transcript of the October 1, 1993 proceedings." Gov't Letter re Plea Minutes, Feb. 24, 2016, ECF No. 36. Mr. Moncrieffe's plea minutes were not before the immigration authorities and are not available for consideration in the instant case. *See* Hr'g Tr., Feb. 25, 2016, at 35:14–17.

### i. BIA Inference Impermissible

The BIA based its finding that Mr. Moncrieffe was convicted of a firearms offense upon an inference derived from the charges in the indictment, the language in the indictment referencing a "handgun," and Mr. Moncrieffe's admission at the immigration proceedings. Reliance on this kind of information is prohibited. It is contrary to the fundamental principles underlying both the "categorical" and any "modified categorical" approaches.

The analysis under the categorical approach requires careful matching of the statute of conviction with the corresponding federal statute. Prohibited is any inquiry into the facts underlying the conviction. As early as December 1949, New York Court of Appeals judge Stanley H. Fuld, formerly head of the Appeals Bureau for the New York District Attorney Thomas E. Dewey and the leading expert on criminal law, explained the required strict analysis in the context of New York's second offense rule (providing that a defendant convicted of a felony in New York was to be punished as a second felony offender if he was previously "convicted under the laws of any other state of a crime which, if committed within this state, would be a felony"):

> Since an indictment not infrequently contains immaterial and nonessential recitals, we cannot determine the "crime" with which a defendant is charged—and, of course, of which he is convicted—by mere examination of the indictment's allegations. To ascertain that "crime," we must of necessity consider the statute which created and defined it and upon which the indictment was based.

*People v. Olah*, 300 N.Y. 96, 98 (N.Y. 1949).

The government argues that section 160.15 is a "divisible" statute, and agrees that only subsections (2) and (4) trigger deportation. It contends that, pursuant to a "modified" categorical approach applicable to divisible statutes, a court may refer to "other documents" and need not "limit [itself] to the elements of the crime." Hr'g Tr., Feb. 25, 2016, at 32:12–16. The defendant disputes the applicability of any such "modified" categorical approach to the instant case. Whether the categorical or a modified categorical approach applies is of no consequence—the BIA's analysis relied on information impermissible under either framework.

Where a statute is "divisible," meaning that certain categories of proscribed conduct trigger deportation but some do not, a "modified" categorical approach has at times been considered appropriate. *See Akinsade v. Holder*, 678 F.3d 138, 144 (2d Cir. 2012), *as amended* (May 11, 2012). Pursuant to such a "modified" categorical approach, it is sometimes said that a court "may refer to the record of conviction to ascertain whether a petitioner's conviction was under the branch of the statute that proscribes removable offenses." *Id.* (citing *Wala v. Mukasey*, 511 F.3d 102, 107 (2d Cir. 2007)) (internal quotation marks omitted). While the record of conviction has been said to include "a charging document (such as an indictment), a signed plea agreement, a verdict or judgment of conviction, a record of the sentence; a plea colloquy transcript, and jury instructions . . . the BIA may rely only upon facts to which a defendant '*necessarily pleaded*' in order to determine the type of conduct that represented the basis of an alien's conviction." *Id.* (internal quotation marks and citations omitted) (emphasis added); *see also Dulal–Whiteway v. U.S. Dep't of Homeland Sec.*, 501 F.3d 116, 131 (2d Cir. 2007) (holding that the BIA may only consider "facts to which a defendant *actually and necessarily pleaded* in order to establish the elements of the

offense, as indicated by a charging document, written plea agreement, or plea colloquy transcript")
(emphasis added).

In the instant case, the BIA acknowledged that only two of the four subsections in New
York Penal Law section 160.15 could prompt deportation predicated upon a firearms offense. It
also noted that Mr. Moncrieffe's judgment of conviction did not specify under what subsection of
section 160.15 he was convicted. Rostal Decl., Exhibit B, BIA Decision of Oct. 24, 1995, at
SM00059–60. Defendant's plea agreement or colloquy were not before the BIA and were not
considered by it. Yet, the BIA "*inferred*" that Mr. Moncrieffe was convicted of either subsection
(2) or (4) based on the information in the indictment and Mr. Moncrieffe's own admissions at the
immigration proceedings. *Id.* (emphasis added).

The BIA's inference was impermissible. *First*, the BIA's reliance on Mr. Moncrieffe's
admissions at his deportation hearings is misplaced—such immigration hearing testimony is
irrelevant under any categorical approach and plainly does not constitute part of the limited state
"record of conviction" that a court may consider under the modified categorical approach. As
explained by the BIA in a 1996 decision:

> We will . . . limit our inquiry to the respondent's Certificate of
> Disposition, despite his testimony that the weapon in his possession
> at the time of his arrest was a gun, *since it is the crime that he*
> *actually was convicted of rather than a crime that he may have*
> *committed which is the determinative issue to be resolved here*.
>
> Moreover, the principle of not looking behind a record of conviction
> provides this Board with the only workable approach in cases where
> deportability is premised on the existence of a conviction. If we
> were to allow evidence that is not part of the record of conviction as
> proof of whether an alien falls within the reach of section
> 241(a)(2)(C) of the Act, we essentially would be inviting the parties
> to present any and all evidence bearing on an alien's conduct leading
> to the conviction, including possibly the arresting officer's
> testimony or even the testimony of eyewitnesses who may have been
> at the scene of the crime. Such an endeavor is inconsistent both with
> the streamlined adjudication that a deportation hearing is intended

> to provide and with the settled proposition that an Immigration Judge cannot adjudicate guilt or innocence.
>
> If we were to make an exception here and accept the respondent's testimony as proof of his deportability under section 241(a)(2)(C) of the Act, there would be no clear stopping point where this Board could limit the scope of seemingly dispositive but extrinsic evidence bearing on the respondent's deportability. *We believe that the harm to the system induced by the consideration of such extrinsic evidence far outweighs the beneficial effect of allowing it to form the evidentiary basis of a finding of deportability*.

*Matter of Pichardo-Sufren*, 21 I&N Dec. 330, 335–36 (BIA 1996) (internal citations omitted) (emphasis added).

*Second*, the BIA relied on the indictment to summarily conclude that Mr. Moncrieffe must have pled guilty to one of the crimes he was charged with. This is contrary to the requirement that, to the extent reference to the record of conviction is allowed, it must only be used in order to determine what a defendant "*actually and necessarily pleaded to*." *James v. Mukasey*, 522 F.3d 250, 257–58 (2d Cir. 2008) (internal quotation marks and citation omitted) (emphasis added).

Mr. Moncrieffe's judgment of conviction only showed he was convicted of robbery in the first degree—it did not indicate which of the available four subsections of section 160.15 he pled guilty to. Neither defendant's plea agreement nor his pleading transcript were before the immigration authorities. Instead, the BIA turned to the indictment and inferred that Mr. Moncrieffe must have pled guilty to one of the implied charged offenses.

The Court of Appeals for the Second Circuit has indicated that an official may not assume that a guilty plea to a given criminal statute is based on the theory of the crime set forth in the charging instrument; the question is what was "*actually and necessarily pleaded to*," as revealed by a transcript of the plea or equivalent evidence. *Mukasey*, 522 F.3d at 257–58 (internal quotation marks and citation omitted) (emphasis added). In *Mukasey*, the court determined that the immigration judge and BIA "relied upon a factual allegation in the charging instrument . . . to

conclude that [plaintiff] was convicted of sexual abuse of a minor.  But this factual allegation was not 'actually and necessarily pleaded' to in order to establish the elements of endangering the welfare of a child."  *Id.* at 257 (citation omitted).  As in *Mukasey*, Mr. Moncrieffe did not "actually and necessarily" have to plead to the use of a weapon or firearm in order to be found guilty of robbery in the first degree.

Judge Fuld explained, over sixty years ago in the context of New York's second offense statute,

> The application of section 1941 cannot be made to turn upon the expansiveness of the prosecutor who prepared and drafted the indictment in the other State.  One prosecutor may content himself with pleading only essential allegations, while another may choose to include immaterial and surplus recitals.  *Liberty—even of habitual malefactors—is too important to depend upon the drafting technique or the pleading preference of a particular official.*

*Olah*, 300 N.Y. at 101 (emphasis added).  Deportation is a drastic measure.  It cannot turn on dubious inferences, when the law requires a rigorous comparative analysis of the statutes in question.

The government contends that defendant's criminal history shows defendant pled guilty to section 160.15(2).  It cites to Federal Bureau of Investigation ("FBI") criminal history records dated February 20, 2002 (Gov't Opp'n Mem., Ex. 4, NCIC Query Results, Feb. 20, 2002, ECF No. 29-4, at SM00100) and July 10, 2015 (Gov't Opp'n Mem., Ex. 5, FBI Record, July 10, 2015, ECF No. 29-5, at SM000027).

These documents are not part of the record of conviction upon which a court may rely in determining what a defendant "actually and necessarily pleaded to."  *See Akinsade*, 678 F.3d at 144–45.  Courts have determined that such "[r]ap sheets lack the necessary information to describe the full record of conviction and do not necessarily emanate from a neutral, reliable source." *Francis v. Gonzalez*, 442 F.3d 131, 143 (2d Cir. 2006).  The Court of Appeals for the Second

Circuit has recognized that, "[i]n identifying reliable evidence, there are good reasons to prefer records emanating from neutral courts and magistrates instead of from agencies whose jobs are to seek to detect and prosecute crimes," adding that, "[i]n addition to biases, there may also be increased possibility of error the farther the information spreads from its original source." *Id.* In any event, these secondary documents relied upon by the government were not considered by the immigrant judge or the BIA.

In the absence of clear, reliable evidence from Mr. Moncrieffe's record of conviction indicating what subsection of 160.15 he "actually and necessarily pleaded to," the BIA's finding that he was deportable because he was convicted of a firearms offense cannot be sustained. *See Matter of Pichardo-Sufren*, 21 I. & N. Dec. at 336 (finding that a charge of deportability under section 241(a)(2)(C) of the INA had not been proven where "[t]he only document in evidence . . . which constitutes a part of [the defendant's] 'record of conviction' fails to identify the weapon which he was convicted of possessing, the subdivision of the criminal statute that he was convicted under, and the essential elements of the offense which he was convicted of committing"). This issue was discussed extensively at the hearing on defendant's motion to dismiss the indictment:

> MS. WASHINGTON [for the government]: Your Honor, the government's position is that because the robbery in the first degree statute is a divisible statute, [the] Board of Immigration Appeals was allowed to look at other documents and I think where we are getting lost is whether or not the weapon -- the second prong with respect to a deadly weapon is broader than the federal definition.
>
> […]
>
> But there is a section of the hypothetical that the Court provides, which is --
>
> THE COURT: Which court is this?
>
> MS. WASHINGTON: This is the Supreme Court.
>
> […]

THE COURT:  Whose opinion is this?

MS. WASHINGTON:  This is the Supreme Court's opinion.

THE COURT:  Who wrote it?

MS. WASHINGTON:  Justice Kagan.  It says, so assume along the lines of the Ninth Circuit's example, that a statute criminalizes assault with any of eight specified weapons, and suppose further as the Ninth Circuit did that only assault with a gun counts as a Career Criminal Act offense, [the] later sentencing court need only check the charging documents and instructions to determine whether in convicting a defendant under that divisible statute the jury necessarily found that he committed the act of qualifying crime. . . .

She is just giving a hypothetical to say that if you have a divisible statute, which the government contends that the robbery in the first degree statute is, a court, or in this case [the] Board of Immigration Appeals, can look to other documents. You don't just have to limit yourself to the elements of the crime.

THE COURT:  . . .  I am not going to allow a deportation because a District Attorney fluffs up his indictment with . . . stuff that doesn't count or they have a colloquy about it.  It doesn't seem to me it comports with what we are talking about.  It has to be the terms of the statute.

[…]

MS. WASHINGTON:  Your Honor, the government cited to -- I can read it here.  Again, even in *Reno*, which is another case, it says that when a criminal statute is divisible into multiple categories of offense conduct, some but not all of which constitute removable offenses, the Court may refer to the record of conviction.

THE COURT:  But if he pleads to the statute which includes non-deportable offenses, that's all he pleads to, do you plead guilty to the commission of crime (A)?  If (A) has one, two, three, four, five and only five is a crime of violence or gun case, he hasn't pleaded to five.  Nobody knows what he's pleaded to.

MS. WASHINGTON:  Your Honor, we don't have the plea. Unfortunately, we don't have the plea.

THE COURT:  We don't have the plea.  That's the case I have.  I do not have the plea.  I do not have the transcript.  The assumption of the hearing officer, as I understand it, was that he pleaded

generally, not to (a)(1) or (a)(2) or (a)(3), but to (A). . . . Isn't that so?

MS. WASHINGTON:  The determination of Board of Immigration Appeals was that he pled either to use of a deadly weapon --

THE COURT:  . . .  How [did] the Board know that?

MS. WASHINGTON:  The Board looked to both the indictment and to the defendant's own testimony at the Immigration --

THE COURT:  Was he indicted under a subdivision, specific subdivision?

MS. WASHINGTON:  Correct. He was indicted under the subdivision with respect to use of a deadly force and with respect to a display of a weapon, which --

THE COURT:  Let me see the indictment, please.

MS. WASHINGTON: Which lists a number of weapons. . . .  I think that's the dispute. Board of Immigration Appeals assumed that he pled to either subsection 2 or subsection 4 because those were the subsections charged.

THE COURT:  You can't assume that.  What did he plead to?

MS. WASHINGTON:  Your Honor, the Board of Immigration Appeals is allowed to under the rules [to] consider a number of different documents with respect to determining the record of conviction, including the charging document.

THE COURT:  What did he plead to?  Did he say, I plead to a specific subdivision?

MS. WASHINGTON:  Your Honor, we don't have the plea minutes.

THE COURT:  Then I will assume . . . that he pleaded not to a subdivision but to the section, which is what the hearing officer also assumed.

MS. WASHINGTON: The hearing officer in the Board of Immigration Appeals assumed that he pled to either subsection 2 or subsection 4.

THE COURT:  How could he make an assumption?  He wasn't there.

[…]

MS. WASHINGTON: That's the inference that the Board of Immigration -- Your Honor, it is the government's position that Board of Immigration Appeals was permissibly allowed to consider a document.

THE COURT: No, it can't. It is not allowed to make any such assumptions as to what happened. What's the reality? You have a kid who is before a state court for a crime. He is trying to help out or not help out. He is trying to get out or not get out.

Hr'g Tr., Feb. 25, 2016, at 30:21–36:25.

### ii. No Categorical Match in "Firearm" Definition

The defendant correctly notes that, even if, *arguendo*, one were to assume the BIA's inference to be proper, there is no categorical match between the New York State definition of "firearm" and that provided in the relevant federal statute. *See* Hr'g Tr., Feb. 25, 2016, at 13:15–15:4. Section 241(a)(2)(C) of the INA referred to the definition of "firearm" as provided for under section 921(a) of Title 18 of the United States Code. Pursuant section 921(a)(3) an antique firearm is not a "firearm" under the federal statutes:

> The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. *Such term does not include an antique firearm.*

18 U.S.C. § 921(a)(3) (emphasis added).

An "antique firearm" is defined as including any firearm manufactured "in or before 1898." 18 U.S.C. § 921(a)(16)(A). New York's definition of "firearm" does not exclude in terms weapons manufactured in or before 1898. *See* N.Y. Penal Law §§ 265.00(3), (14).

Even though the handgun a defendant carried would not be considered a "firearm" for purposes of the relevant federal statute, it could still fall within the New York definition of firearm. *See* 18 U.S.C. § 921(a); *see also* Hr'g Tr., Feb. 25, 2016, at 30:16–20, 14:20–22 ("[T]here are things that are criminally punishable [as] guns in New York that are federal antiques and therefore don't fall under the removal ground . . . .").

Assuming the BIA were allowed to look at the state record, there is no evidence to indicate that the "handgun" allegedly displayed by Mr. Moncrieffe as provided for in the indictment was a handgun falling within the federal definition of a "firearm" under section 921(a). *See* Hr'g Tr., Feb. 25, 2016, at 39:3–14. The categorical analysis, whether "modified" or not, requires a strict approach: "We are dealing with a very specific charge and a very specific offense and they have to overlap completely." *Id*. at 40:12–14 (court's statement). This is not the case here. The BIA's finding that Mr. Moncrieffe satisfied the criteria of then-applicable INA section 241(a)(2)(C) was erroneous.

### 2. Denial of Section 212(c) Relief on Comparable Grounds

Prior to its repeal, section 212(c) stated in relevant part that "[a]liens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General . . . ." § 212(c), 8 U.S.C. § 1182(c) (1994). Defendant contends that, while former section 212(c) as written only applied to lawful residents seeking to waive grounds of exclusion when returning to the United States from abroad, "courts held that § 212(c) relief was equally available to permanent residents who, like Mr. Moncrieffe, had not departed, but who had lived for seven consecutive years in the United States and were facing possible deportation under the separate grounds of deportability that applied to those already present in the United States." Def.'s Mot. to Dismiss, at 27–28 (citing *INS v. St. Cyr*,

533 U.S. 289, 294 (2001); *Francis v. INS*, 532 F. 2d 268, 273 (2d Cir. 1976); *Matter of Silva*, 16 I&N Dec. 26 (BIA 1976)).

After determining that defendant's 1993 robbery conviction amounted to a deportable offense in that it qualified as an aggravated felony and firearms offense, the BIA found—and told defendant—that no relief under the then applicable section 212(c) was available to him. According to the BIA, relief under former section 212(c) was available only if the non-citizen was subject to a "ground of deportability for which there is a comparable ground of excludability." *See* Rostal Decl., Ex. B., BIA Decision of Oct. 24, 1995, at SM000060–61. The BIA concluded that because Mr. Moncrieffe had been found deportable pursuant to section 241(a)(2)(C) (providing removal for certain firearms offenses), "a section having no counterpart among the enumerated grounds of exclusion, he [was] ineligible as a matter of law for relief under section 212(C) of the Act, notwithstanding the fact that he has resided in this country for the past 13 years as a lawful permanent resident." *See id.* at SM000061.

Defendant argues that the "comparable ground" understanding of the scope of the section 212(c) waiver was inapplicable and has since been discredited by the Supreme Court, which called the "comparable grounds" rule "arbitrary and capricious" in *Judulang v. Holder*, 132 S. Ct. 476 (2011). According to defendant, he qualified for relief under section 212(c) because at the time of the deportation hearings "he had lawfully resided in the United States for at least seven years, and had not been incarcerated for more than five years for an aggravated felony." Def.'s Mot. to Dismiss, at 28. Defendant argues that the BIA improperly denied him relief solely based on the now discredited and inapplicable "comparable grounds rule." The government counters that the BIA properly applied the available rule at the time of defendant's deportation proceedings. *See* Gov't Opp'n Mem., at 27–28.

Because the BIA incorrectly determined that Mr. Moncrieffe was deportable, the parties agreed that the court need not reach the merits of defendant's section 212(c) challenge. *See* Hr'g Tr., Feb. 25, 2016, at 7:9–22. Should the Court of Appeals for the Second Circuit disagree with this court's analysis, the section 212(c) challenge can be separately addressed.

### 3. Prejudice

In order to show fundamental unfairness pursuant to section 1326(d)(3), a defendant must demonstrate that a fundamental procedural error resulted in prejudice. *See Copeland*, 376 F.3d at 70. "Prejudice is shown where there is a *reasonable probability* that, but for the error, the result of the proceeding would have been different." *United States v. Daley*, 702 F.3d 96, 100 (2d Cir. 2012) (alterations and citations omitted) (emphasis added); *Fernandez-Antonia*, 278 F.3d at 159 (to demonstrate prejudice, a non-citizen "must show that his proceeding contained errors so fundamental that he *might* have been deported in error") (emphasis added); *Sosa*, 387 F.3d at 138 ("An alien is prejudiced by a fundamental procedural error 'where there is a reasonable probability that, but for the [immigration judge's] unprofessional errors, the alien would have been granted Section 212(c) relief.'") (quoting *Copeland*, 376 F.3d at 73).

In the instant case, Mr. Moncrieffe was prejudiced by the fundamental errors of the immigration judge and BIA. Their conclusion that defendant was deportable was based on a misapplication of the required categorical approach. Had the BIA properly applied the categorical approach, it would have determined that the record before it was insufficient to establish that defendant had committed "a crime of violence" and a crime involving a firearm. Mr. Moncrieffe should not have been deemed deportable, and his immigration proceedings should have been terminated in his favor.

## VI.    Conclusion

Mr. Moncrieffe has satisfied the elements of section 1326(d).  He exhausted his administrative remedies by appealing the immigration judge's decision to the BIA.  He was deprived of the opportunity for judicial review because he was mistakenly and repeatedly told during the immigration proceedings, at which he appeared *pro se*, that no relief was available to him.  Mr. Moncrieffe's 1995 deportation order was fundamentally unfair in that it was based on a misapplication of the requisite categorical approach.  He was prejudiced; had the immigration judge and BIA properly applied the categorical approach, he would not have been deemed removable and the deportation proceedings would have been terminated.

Because the deportation order on which Mr. Moncrieffe's illegal reentry charge is based is invalid, defendant was wrongfully deported and he, in effect, never left the country.

Defendant's motion to dismiss the indictment is granted.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:    March 10, 2016
         Brooklyn, New York